IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Marriage of<br><br>AARON ROSS FREUDENBURG,<br><br>     Respondent,<br><br>   v.<br><br>MIKELA FORSHE FREUDENBURG,<br><br>     Appellant. | No. 83030-9-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

   CHUNG, J. — Mikela Freudenburg and Aaron Freudenburg were married in November 2014 and had one daughter, A.F. In December 2019, Aaron filed for dissolution. Before trial, the court entered a restraining order against Mikela after she left the state with A.F. The court entered final dissolution orders and a parenting plan that placed limitations on Mikela based on emotional and physical problems and substance abuse problems that impacted her ability to parent, as well as for withholding A.F. from Aaron absent good cause. The court gave Aaron the majority of time with A.F. and sole decision-making power over major decisions. Aaron then filed a petition seeking to relocate to Maryland, which the court granted. Mikela appeals the restraining order, the dissolution orders and parenting plan, and the relocation order. She also claims racial bias affected the proceedings. As we find no error, we affirm.

FACTS

Mikela Freudenburg and Aaron Freudenburg were married on November 10, 2014. At the time of their marriage, Aaron[1] was a Chief Petty Officer in the Navy stationed in San Diego, California. In March 2017, the couple's only child, A.F., was born in San Diego. In November of 2018, Aaron's job required the family to relocate to Everett, Washington. Aaron's job in the Navy often required him to be deployed for six or seven months at a time. Shortly after moving to Washington, Aaron was deployed for five weeks. While Aaron was away, Mikela looked for a daycare for A.F. and looked for jobs. However, Mikela's desire to find a job caused some tension in the couple's relationship. For example, Mikela testified that she found a temporary internship but that Aaron "did not want me to work. He didn't want [A.F.] in a daycare." Aaron felt there "was a lot on [Mikela's] plate" that "she was getting really overwhelmed" and that "it wasn't going to end well."

On March 28, 2019, Aaron deployed again for seven months, while Mikela stayed in Washington with A.F. Aaron reported that over the course of this deployment, he became increasingly more concerned about Mikela's mental health and ability to take care of A.F. Specifically, Aaron was concerned about a series of text messages sent to him by Mikela that stated, among other things, "I want you to understand I have mental health issues," "I'm drinking every night . . . [I'm] [n]ot myself," and "I smoke weed every single night after [A.F.] sleeps." Mikela explained that at the time she sent the text messages, she was simply

---

[1] Because of the parties' shared last name, we use their first names for clarity.

confiding in Aaron that it was difficult to be "doing everything on my own in Washington with him gone." Additionally, in May 2019, Mikela sent A.F. to San Diego for five weeks to stay with her family while she completed her degree program and her temporary internship.

After several months of deteriorating relations between the couple, in early October 2019, Mikela informed Aaron of her intent to separate from him and officially moved out of the family home in Everett on October 26, 2019. On December 6, 2019, Aaron filed a petition for dissolution in Snohomish County Superior Court. On January 10, 2020, the court entered a temporary parenting plan naming Mikela as the custodial parent and requiring that any parent who wished to travel with A.F. outside of Washington needed to obtain written approval of the other parent. The temporary parenting plan did not place limitations on either parent but did require both parents to obtain substance abuse evaluations.

Following her separation from Aaron, Mikela began dating Jon-Michael Smith (JM). Mikela testified that after she began living with JM, he began psychologically abusing her. At trial, Mikela testified that in April 2020, a physical incident occurred between her and JM where he "put his hands on me to try to restrain me. . . . [and put] his hand over my mouth," before she was able to call the police. After this incident, Mikela and A.F. stayed with Aaron for approximately three days. Mikela and Aaron both testified that there was significant tension between them about Mikela's relationship with JM. They had an altercation during which Aaron reportedly called Mikela a "prostitute" and

attempted to block her from leaving the house with A.F., resulting in a physical struggle over A.F., and Mikela struck Aaron, which she claimed was an accident because she lost her balance.

Mikela remained with JM until November 2020. Between the hours of 11:30 p.m. and 4:00 a.m. of November 4-5, 2020, Mikela sent Aaron 74 text messages indicating her desire to leave her abusive relationship with JM and to get out of Washington. For instance, Mikela texted, "Please can I take [A.F.] with me. . . I'm planning to [move] in 2 weeks . . . Can you take [vacation] and fly with [A.F.] and I please . . . Please take leave . . . I need you to help me move . . . Please let me go back to California." Aaron testified that he initially did not "respond to it because this is all just a broken record," but on November 7, 2020, he responded and told Mikela that pursuant to the January 10 temporary parenting plan, she was not to leave Washington. Mikela responded, "Never was going to." Nevertheless, on or about November 9,[2] Mikela picked up A.F. from daycare and began driving to San Diego, where she arrived approximately three days later.

On November 12, 2020, Aaron learned that A.F. had not been to daycare all week. He attempted to contact Mikela and her family in San Diego, to no avail. After several days of no contact from Mikela and checking her apartment and JM's house for her whereabouts, Aaron testified that he thought that Mikela had gone to San Diego and called the San Diego Police Department (SDPD) to do a

---

[2] Aaron testified that the daycare said Mikela picked up A.F. on Monday, November 9. Mikela testified that they drove out "after I got [A.F.] from school which was – the 8th is when I left Jon-Michael – I have to recap – which was a Sunday night, the 9th."

4

wellness check at her parents' house. On November 14, 2020, SDPD located Mikela and A.F. at Mikela's parents' house. Aaron testified that at no point did he give Mikela permission to take A.F. to San Diego. Mikela admitted at trial that she had not contacted Aaron until November 14 because she was concerned that Aaron was in contact with JM.

On December 1, 2020, Mikela filed a notice of intent to relocate. Aaron testified he was not served with the notice until December 15. However, on December 11, 2020, Aaron sought and was granted an ex parte restraining order against Mikela, which was extended to a 12-month temporary restraining order (TRO) after a hearing on December 18, 2020. The court also entered an amended temporary residential schedule giving Aaron the majority of the time with A.F. and permitting Mikela to have supervised visits.

On February 1, 2021, Aaron was charged with assault in the fourth degree involving domestic violence regarding an incident with his then-girlfriend LaToya Jones. A domestic violence protection order (DVPO) was entered against Aaron. A separate investigation by the Navy found that Aaron had met the criteria for physical abuse of a partner.

The dissolution trial included six days of testimony between February 8, 2021 and March 22, 2021, and the parties presented proposed orders on June 4, 2021. On July 22, 2021, the dissolution court entered its final orders (dissolution orders) dissolving the marriage and ordering child support payments to Aaron. The court also entered a final parenting plan naming Aaron as the primary residential parent, i.e., the parent with whom the child would reside the majority

of the time, and giving him sole decision-making authority for major decisions. The court placed limitations on Mikela for emotional or physical problems (mental health problems), substance abuse, and withholding A.F. from Aaron, and ordered Mikela to obtain a psychological evaluation and to comply with any resulting recommendations. The court also ordered both parents to obtain substance abuse evaluations listing each other as collateral contacts and to comply with any resulting recommendations. The parenting plan included a relocation provision that required either parent with at least 45 percent of residential time to provide a 60-day notice before a relocation. Mikela filed a notice of appeal of the December 18, 2020 TRO and amended temporary parenting plan as well as the July 22, 2021 final divorce order, findings of fact and conclusions of law, final parenting plan and the child support order.

Less than a month after the dissolution orders were entered, on August 12, 2021, Aaron filed a notice of relocation to Maryland that stated his intended date to move was October 8, 2021. Mikela filed an objection to the relocation on September 15, 2021, arguing that Aaron had not provided a 60-day notice despite his knowledge of the move for several months.[3] On November 1, 2021, Mikela filed a motion for contempt. On November 19, 2021, Aaron was found in contempt for not providing Mikela with a 60-day notice, but the court found that it could be purged by allowing Mikela residential time at Thanksgiving and by providing Mikela with his previous substance abuse evaluation.

---

[3] Mikela's objection also identifies various other reasons that she was concerned about Aaron's possible relocation, including the impact it would have on A.F., the disruption to her bond with A.F., and concerns about abuse perpetrated by Aaron.

The relocation trial began in December 2021 and concluded on May 8, 2022, after 13 days of testimony. On August 5, 2022, the court issued a memorandum decision granting the relocation and setting out its analysis.[4] The court permitted the parties to present additional information regarding the specifics of the parenting plan, as specifics would be dependent on where the parties were living.

On April 4, 2023, the court entered final orders (relocation orders) granting Aaron's relocation with A.F. to Maryland. The relocation court made changes to the dissolution orders regarding child support and the parenting plan and incorporated by reference the August 2022 memorandum decision and an exhibit to the order explaining its findings and conclusions about relocation and modifications to the parenting plan. The relocation court found that Aaron had a history of substance abuse and had failed to complete his evaluation and treatment as required by the dissolution order, but that he was "not currently drinking alcohol, so the history is not currently impacting his parenting." Thus, the court opted not to place limitations on his residential time, and instead placed conditions on him to seek substance abuse treatment or evaluation. Also, the relocation court found that although Mikela did have a history of mental health problems and substance abuse, these problems no longer impacted her ability to parent; thus, the court placed no limitations on her residential time based on these issues. However, it did note that both parties had problems with violence, and while they did not require mandatory limitations, the court imposed

---

[4] The court noted the letter was not a formal order and required the parties to prepare an order consistent with its decision.

conditions on both based on concerns about domestic violence, substance abuse, and Mikela and A.F.'s mental health.

Mikela timely appealed the trial court's April 4, 2023 order granting relocation and findings about modifying the parenting plan in accordance with relocation. This appeal was consolidated with her prior appeal of the TRO, parenting plan, final dissolution order, findings of fact and conclusions of law, and the child support order.

DISCUSSION

Mikela challenges multiple aspects of the dissolution court's orders, including its findings placing limitations on her and its failure to place limitations on Aaron. She also challenges the dissolution court's order naming Aaron as primary residential parent and giving him sole decision-making power, its imposition of reasonable travel costs on her, and its refusal to reopen testimony. She also challenges the relocation court's grant of relocation and its findings and limitations placed on the parties. Overall, she challenges the treatment of her evidence as harmful racial stereotyping in violation of her equal protection rights. We address each claim in turn.

I.      Dissolution Court Orders

On appeal, we review parenting plans for an abuse of discretion. In re Marriage of Chandola, 180 Wn.2d 632, 642, 327 P.3d 644 (2014). An abuse of discretion occurs when the trial court's decision was manifestly unreasonable or based on untenable grounds or untenable reasons. In re Marriage of Katare, 175 Wn.2d 23, 35, 283 P.3d 546 (2012). However, a trial court's findings of fact are

reviewed for substantial evidence. DeVogel v. Padilla, 22 Wn. App. 2d 39, 48, 509 P.3d 832 (2022). In general, there is a presumption in favor of the trial court's findings, so the party claiming error has the burden of demonstrating that a finding is not supported by substantial evidence. Fisher Props., Inc. v. Arden-Mayfair, Inc., 115 Wn.2d 364, 369, 798 P.2d 799 (1990). "The trial court's findings of fact will be accepted as verities by the reviewing court so long as they are supported by substantial evidence." Katare, 175 Wn.2d at 35. "Substantial evidence is that which is sufficient to persuade a fair-minded person of the truth of the matter asserted." Id.

### A. Restraining Order

Mikela claims that the trial court erred by removing A.F. from her custody pursuant to the December 2020 restraining orders and by naming Aaron as the parent with whom A.F. would reside a majority of the time in the modified temporary parenting plan. She contends that there was not substantial evidence warranting RCW 26.09.191 limitations on her parenting time and that the trial court did not appropriately consider the RCW 26.09.197 factors for determining residential time in a temporary parenting plan. However, beyond citing the statute, Mikela does not engage in analysis of the evidence and instead makes the conclusory statement that "[n]o substantial evidence was introduced" that supported the .191 restrictions.

The record shows that during the December 18, 2020 hearing on Aaron's request for a temporary restraining order, the trial court heard from both parties, and it was undisputed that Mikela took A.F. to San Diego absent Aaron's consent

9

and allowed Aaron contact with A.F. only after he had involved police and the courts. The court noted that it could make amendments to temporary orders if there is a change of circumstance, citing RCW 26.09.194(4) and Local Rule 94.04(g). Further, the trial court explained that it was granting Aaron the change of custody due to its concerns for Mikela's mental health and behavior in withholding A.F. The court's stated concerns were supported by substantial evidence, and RCW 26.09.191(3) gives a court discretion to limit a parent's residential time when their conduct "may have an adverse effect on the child's best interests," including when the parent has withheld the child. The trial court did not abuse its discretion in changing the temporary parenting plan to name Aaron the primary residential parent.

B. <u>Limitations Placed on Mikela</u>

RCW 26.09.191 governs limitations a court must and may place on a parent's residential time. When a parent has a history of domestic violence or commits an assault that causes grievous bodily harm or fear of harm, a court *must* impose limitations. RCW 26.09.191(2)(a). By contrast, under RCW 26.09.191(3), a trial court has the discretion to limit a parent's residential time when their conduct "may have an adverse effect on the child's best interests." These permissive limitations include when the parent has emotional or physical issues, substance abuse issues, or has withheld the child. RCW 26.09.191(3). A trial court can impose limitations only when it finds that the impact on the child is more than what normally arises amid a dissolution and "only where substantial evidence shows 'that a danger of . . . damage exists.' " <u>Chandola</u>, 180 Wn.2d at

10

645 (quoting Katare, 175 Wn.2d at 36). This is a "particularized finding of a specific level of harm." Id. at 646.

Mikela assigns error to the dissolution court's findings in the parenting plan that resulted in RCW 26.09.191 limitations (".191 limitations") on her, including the following:

> **Emotional or physical problem** – Mikela Freudenburg has a long-term emotional or physical problem that gets in the way of her ability to parent.
> **Substance Abuse** – Mikela Freudenburg has a long-term problem with drugs, alcohol or other substances that gets in the way of her ability to parent.
> **Withholding the child** – Mikela Freudenburg has kept the other parent away from [A.F.] for a long time, without good reason.

First, Mikela contends that the trial court's finding that she had "emotional or physical problems" that impacted her ability to parent was not supported by substantial evidence. In support, she points to an evaluation for substance abuse disorder conducted on April 2021 as part of a parenting plan agreement, in which Dr. Colin Naughton noted her self-reported "good physical and mental health." But "[e]ven where the evidence is conflicting, we need determine only whether the evidence most favorable to the respondent supports the challenged findings." Miller v. Badgley, 51 Wn. App. 285, 290, 753 P.2d 530 (1988); see also Herdson v. Fortin, 26 Wn. App. 2d 628, 637, 530 P.3d 220 (2023), review denied, 2 Wn.3d 1009, 539 P.3d 7 (2023) (" '[W]e will not substitute our judgment for the court's' even if this court might have reached a different result.") (quoting Parkridge v. City of Seattle, 89 Wn.2d 454, 464, 573 P.2d 539 (1978)). At trial, Aaron testified that he became concerned about Mikela's mental health because she sent him messages while he was deployed stating she had "mental health

11

issues" and needed "mental help." Her messages stated that she had "talk[ed] to a suicide hotline," her "mental health [was] slipping," and she was sending A.F. to stay with her relatives in San Diego so she could "get ahold of myself." The record also shows that Mikela had experienced severe depression and suicidal ideations at stressful periods, including when she was diagnosed with cancer and when she miscarried. Thus, while Mikela highlights evidence favorable to her, there was nevertheless substantial evidence to support the dissolution court's finding that she had "emotional or physical problems" that impacted her ability to parent.

Similarly, Mikela challenges the court's finding of substance abuse issues that affected her parenting by pointing to evidence favorable to her. She completed a drug and alcohol evaluation and completed several negative urinalysis tests,[5] and a court-ordered substance use assessment concluded that she did not meet the criteria for a substance use disorder. But other evidence supported the dissolution court's findings. Mikela did not dispute that she sent messages to Aaron while he was deployed stating that she was "drinking every night" and had taken to using "weed every single night after [A.F.] sleeps" to help her cope with her stresses. In implementing a parenting plan, a court can consider a parent's history of drug use. See, e.g., In re Marriage of Pennamen, 135 Wn. App. 790, 804, 146 P.3d 466 (2006) (court could consider history of drug use where parent did not seek treatment until three weeks before trial).

---

[5] The tests themselves were not admitted into evidence at trial. Aaron objected based on authenticity; he argued that because the document was cut off at the bottom, they could not confirm whether the tests had been monitored.

Thus, even though there was evidence that she did not have a substance use disorder and was able to successfully pass screenings, there was also substantial evidence supporting the dissolution court's finding that she had substance abuse issues that impacted her ability to parent.

Finally, there was also substantial evidence to support the dissolution court's finding that she withheld A.F. from Aaron without good cause. The temporary parenting plan mandated that a parent could not travel outside of Washington with the child without giving at least one week of notice and obtaining the written approval of the other parent. Mikela testified that she had been told by domestic violence advocates to get to safety. Mikela also sent Aaron text messages stating, "I need to get [] out of this state," "[p]lease can I take A.F. with me," and "I'm planning to do it in 2 weeks," and that she was "scheduling a mover to pack my apartment." Mikela claims this was sufficient notice of her travel plans and demonstrates the urgent reason for her departure. She admitted that she breached the temporary parenting plan but argues that she was gone for only a short period. Further, she claims she did not withhold A.F. absent good cause, as she allowed A.F. to speak with Aaron regularly while they were in San Diego.

But as Aaron points out, there was also evidence that Mikela acted in a deceptive manner[6] without providing appropriate notice or obtaining consent for

---

[6] Aaron points to a pattern of Mikela's behavior being deceptive and withholding A.F., including on September 8, 2020 when Mikela told him he could not visit A.F. because the two had to quarantine for COVID-19 protocol. Meanwhile, Mikela told A.F.'s daycare that A.F. had food poisoning. Despite the representations to Aaron and the daycare, she instead took A.F. to San Diego around September 10, 2020.

13

her move. For example, after her November 5 messages pleading with Aaron to allow her to take A.F. to California, when Aaron reminded Mikela that the temporary parenting plan prohibited her from leaving Washington, Mikela responded that she "[n]ever was going to." Mikela had initially agreed to let Aaron have A.F. for Veterans Day on November 11 but later changed her mind. Instead, Mikela picked up A.F. from daycare on or around November 9 and traveled to California without informing Aaron. Aaron attempted to contact Mikela but was blocked on all communications, including social media and text. Mikela admitted that she did not contact Aaron or allow A.F. to communicate with him until after the police had completed their wellness check on November 14, 2020. Then, while in San Diego, Mikela filed a Notice of Intent to Relocate, which suggests that contrary to her testimony, this was not a temporary stay, but that she intended to move there. Further, A.F. was not returned to Washington until December 19, 2020, the day after Aaron obtained a modified parenting plan and temporary restraining order against Mikela. There was substantial evidence to support the court's finding that Mikela withheld A.F. without good cause.

C. Lack of Limitations Placed on Aaron

Mikela contends that the dissolution court should have entered findings that Aaron had a history of substance abuse and domestic violence that inhibited his parenting abilities and placed .191 limitations on him. Although Aaron does not respond to these claims, the dissolution court's lack of findings as to such issues is "presumptively a negative finding" against Mikela because she failed to carry her burden in demonstrating such limitations should be imposed on him. Morgan v. Briney, 200 Wn. App. 380, 390-91, 403 P.3d 86 (2017) (as the party

14

challenging the categorization of community property in court's property division did not satisfy its burden of showing it was separate property, it was presumed to be a finding against it).

Mikela points to testimony by Aaron's former girlfriend about his excessive drinking habits—i.e. four to six drinks per day. But even if there was evidence that Aaron had a history of substance abuse, Mikela does not identify evidence in the record that it impacted his parenting.

Similarly, the absence of a finding by the dissolution court that Aaron had a history of domestic violence is "presumptively a negative finding." Mikela claims the lack of a finding was error because his former girlfriend testified about an incident between her and Aaron where he grabbed her by the shoulders, and the officer who responded testified about the status of the house and demeanor of the parties. Unlike the trial court, "[a]s an appellate tribunal, we are not entitled to weigh either the evidence or the credibility of witnesses even though we may disagree with the trial court in either regard." In re Welfare of Sego, 82 Wn.2d 736, 739-40, 513 P.2d 831 (1973).

        D.  <u>Parenting Plan Naming Aaron as Primary Residential Parent and as Sole Decision-Maker for Major Decisions</u>

RCW 26.09.187(3) guides a court's determination of the residential provisions for a child in a parenting plan as follows:

> (a) The court shall make residential provisions for each child which encourage each parent to maintain a loving, stable, and nurturing relationship with the child, consistent with the child's developmental level and the family's social and economic circumstances. The child's residential schedule shall be consistent with RCW 26.09.191. Where the limitations of RCW 26.09.191 are not dispositive of the child's residential schedule, the court shall consider the following factors:

(i) The relative strength, nature, and stability of the child's relationship with each parent;

(ii) The agreements of the parties, provided they were entered into knowingly and voluntarily;

(iii) Each parent's past and potential for future performance of parenting functions as defined in *RCW 26.09.004(3)[7], including whether a parent has taken greater responsibility for performing parenting functions relating to the daily needs of the child;

(iv) The emotional needs and developmental level of the child;

(v) The child's relationship with siblings and with other significant adults, as well as the child's involvement with his or her physical surroundings, school, or other significant activities;

(vi) The wishes of the parents and the wishes of a child who is sufficiently mature to express reasoned and independent preferences as to his or her residential schedule; and

(vii) Each parent's employment schedule, and shall make accommodations consistent with those schedules.

Nevertheless, Mikela argues that the dissolution court failed to analyze the RCW 26.09.187 factors for establishing a parenting plan and suggests that if it had considered the factors, there was sufficient evidence that she and not Aaron was the best parent for A.F. to live with.[8]

Although the dissolution court's written parenting plan did not address the .187(3) factors, in its findings of fact and conclusions of law about the marriage, issued along with the final parenting plan, the court stated the basis was the "[t]rial ruling hearing on March 22, 2021." At that hearing, the court explained that RCW 26.09.187(3) guided its decision and that the limitations it placed were based on "admitted evidence" and that it sought to maintain the best interests of the child. The trial court need not address each .187(3) factor in its findings of

---

[7] RCW 26.09.004 was alphabetized pursuant to RCW 1.08.015(2)(k), changing subsection (3) to subsection (2).

[8] Mikela relies in part on her claim, discussed above, that Aaron's alleged history of substance abuse and domestic violence detracted from his ability to parent and should have supported findings against him and limitations on his residential time. As we concluded that the dissolution court did not err in declining to make such findings, Mikela's argument that the findings should have impacted the .187 analysis is also unavailing.

16

fact and conclusions of law. See In re Marriage of Shui & Rose, 132 Wn. App. 568, 591, 125 P.3d 180 (2005) ("[w]hile the trial court did not explicitly address every factor set forth in RCW 26.09.187(3)(a) in its findings of fact and conclusions of law, a review of [court-appointed evaluator]'s report reveals that it encompasses the relevant factors"). The record also shows that the court was presented with and considered evidence relating to the relevant .187(3) factors.

For example, as to the relative strength, nature, and stability of the child's relationship with each parent, the court heard evidence regarding both parents. Aaron testified that he has a "great bond" with A.F. and that he enjoyed teaching her how to swim and ride bikes. The evidence also included messages from Mikela to Aaron stating, "You're a great dad, and [A.F.] needs you in her life at all times." Mikela's sister testified that Mikela was "very loving. She's very attentive to [A.F.], very hands-on, interactive. . . . [S]he cares for [A.F] extremely well." Mikela points to the fact that she was the primary caregiver of A.F. for four years and had a very strong bond with A.F.

The temporary parenting plan sought to maintain the status quo with Mikela as the primary caregiver, given Aaron's work obligations. As to the child's relationship with other people and her environment, Mikela states that A.F. had a strong bond with her family and support system and that her family was "very close with [A.F.]." Mikela's sister testified that she was very close with A.F. and treated "her like one of my own," and often saw A.F. several times a week when the family still lived in California. Neither parent had close family in Washington; Mikela's family lived in California and Aaron's family lived in Nebraska.

Finally, as to the parent's employment schedule, Mikela claims her work accommodated A.F.'s schedule. The evidence was that Mikela's jobs were contract-based and often were short-term and often caused her significant mental exhaustion and stress, but still allowed her time to assist with A.F.'s routine. At the time of trial, she was working toward obtaining a job in public health.

Because the dissolution court entered permissive limitations against Mikela under RCW 26.09.191 based on its findings that substance use and mental health interfered with her ability to parent, and because she withheld A.F. without good cause, RCW 26.09.187(3) required the dissolution court to craft a residential schedule consistent with those limitations.[9] The initial temporary parenting plan had named Mikela as primary residential parent, but Mikela violated the order by taking A.F. to San Diego absent sufficient notice or Aaron's consent. In crafting the final residential schedule, the dissolution court noted that in the event that Aaron had to deploy, Mikela would have more residential time with A.F. if she complied with her assessments and treatments, but that alternatively, Aaron's parents would care for A.F.

We reject Mikela's claims that the dissolution court failed to consider the RCW 26.09.187(3) factors in determining residential provisions when the record indicates it heard and considered relevant evidence. Moreover, while Aaron does not directly respond to Mikela's claim challenging the court's finding that he have

---

[9] Mikela also challenges the residential schedule on the basis that the dissolution court failed to enter RCW 26.09.191 findings based on Aaron's alcohol abuse, but does not provide any further argument to support her position. We need not consider this argument, as we determine the court did not err in failing to make such findings.

18

sole decision-making authority over major decisions for A.F., the court had discretion to fashion decision-making authority "so as to protect children from harmful exposure to parental conflict." In re Marriage of Jensen-Branch, 78 Wn. App. 482, 491, 899 P.2d 803 (1995). Here, the court noted that it was limiting Mikela's decision-making power due to her .191 limitations, which were based on issues that the court found impacted her parenting. And the trial testimony included evidence of parental conflict that included a physical altercation. The court acted within its discretion in granting Aaron sole decision-making power over major decisions.

### E. Reasonable Travel Costs – RCW 26.19.080

Mikela contends that the dissolution court erred by requiring her to pay travel expenses.[10] She claims the court "ignored" the requirement in RCW 26.19.080—the expense of travel should be split in proportion to the court-ordered child support obligations—to punish her and advantage Aaron.

RCW 26.19.080 provides for the allocation of child support obligations as it pertains to special expenses. Notably, RCW 26.19.080(3) provides that "long-distance transportation costs to and from the parents for visitation purposes . . . shall be shared by the parents in the same proportion as the basic child support obligation." Also, this provision provides that "[t]he court may exercise its discretion to determine the necessity for and the reasonableness of all amounts ordered in excess of the basic child support obligation." RCW

---

[10] In its final parenting plan, the dissolution court stated that "Mikela [] shall be solely responsible for the cost of travel for the child to her location at the beginning of her residential time . . . [and] for the cost to travel back to Aaron [] at the end of her residential time."

26.19.080(4). Mikela is correct that long-distance transportation costs should be split by the parents.[11] At the time of the decision by the dissolution court, both parties were still living in western Washington, so RCW 26.19.080(3), regarding long-distance transportation, did not apply.[12] The dissolution court acted within its discretion under RCW 26.19.080(4) to determine what was reasonable for each party to pay for transporting A.F. for visitation based on their residences at the time.

###### E.  Motion to Reopen Testimony

On March 22, 2021, the court closed testimony and after several continuances,[13] scheduled a presentation hearing for June 4, 2021. However, before the hearing occurred, Mikela filed a motion on May 27, 2021,[14] seeking to introduce evaluations that indicated she did not have any outstanding issues that impacted her ability to parent, as well as evidence regarding a domestic violence incident involving Aaron and possible evidence of sexual abuse of A.F. while in Aaron's care. On June 4, 2021, the dissolution court made an oral finding that

---

[11] In re Marriage of Scanlon & Witrak, 109 Wn. App. 167, 181, 34 P.3d 877, as amended on denial of reconsideration (Dec. 19, 2001) (explaining that a trial court does not have discretion to require anything other than a proportional split of long-distance travel expenses).

[12] Alternatively, Aaron maintains that the court was within its discretion to allocate expenses as it did under the reasonableness provision of RCW 26.19.080(4). He asserts that outside of the basic child support obligations and the profit from the sale of their former home, which was awarded to Mikela, the court had discretion to dictate the distribution of expenses for travel as it did. He also claims that regardless of what the provision stated, he assumed the costs of transporting A.F. to Washington for Thanksgiving while the dissolution court's parenting plan was in place. We need not address these arguments as the parenting plan did not pertain to long-distance transportation.

[13] The original presentation hearing was scheduled for March 29, 2021, but was continued until April 27, 2021. However, Mikela and her counsel disagreed about final orders and so it was continued until May 21, 2021. On May 18, 2021, Mikela obtained new counsel. On May 21, 2021, Mikela's new counsel argued for a continuance, which the court granted. The court then scheduled a presentation hearing on June 4, 2021.

[14] In part, Mikela's May 27, 2021 motion to reopen testimony was due to her acquiring new trial counsel on May 18, 2021, who wanted to present these issues. But she does not argue that her change in counsel impacted her ability to present this evidence earlier.

there was not good cause to reopen testimony, and on July 22, 2021, it entered its final dissolution orders, including the parenting plan.

A trial court's decision regarding reopening a cause for additional evidence "will not be reversed except upon a showing of an abuse of discretion and prejudice resulting to the complaining party." Estes v. Hopp, 73 Wn.2d 263, 270, 438 P.2d 205 (1968), quoted in In re Welfare of Ott, 37 Wn. App. 234, 240, 679 P.2d 372 (1984); see also Finley v. Finley, 47 Wn.2d 307, 313, 287 P.2d 475 (1955) (a decision on a motion to reopen trial testimony is reviewed for an abuse of discretion). It is not an abuse of discretion to refuse to reopen testimony when such testimony would be cumulative or is a matter of public record. Tsubota v. Gunkel, 58 Wn.2d 586, 591, 364 P.2d 549 (1961). Further, a court does not abuse its discretion in refusing to reopen testimony when an exercise of due diligence could have produced the proffered evidence at trial. Id.

Mikela argues that the trial court abused its discretion in refusing to reopen testimony that "bore so directly on the health, safety, and welfare of [A.F.]" pursuant to the court's duty to ensure its decision was in the best interest of the child. She relies on In re Welfare of T.B., where the trial court reopened testimony to allow the child's assigned guardian ad litem (GAL) to be examined by the State and the defendant about the "nature and extent of [the GAL's] investigation" of the witnesses at the termination hearings. 150 Wn. App. 599, 605, 209 P.3d 497 (2009). But in T.B., the court reopened testimony to allow the parties to examine the GAL who had participated in the investigation and questioning of witnesses at the hearing for foundational purposes. Here, the

21

evidence does not present the same question of foundation. By contrast, Mikela sought to offer new testimony about new issues. T.B. is inapposite.

Much of the evidence Mikela sought to add to the record was cumulative. The court had already heard evidence regarding her "completed drug and alcohol evaluation from behavior health," so additional evaluations demonstrating her compliance would have been cumulative. Aaron's former girlfriend had already testified at the dissolution trial about the alleged domestic violence incident. The police officer who responded to the former girlfriend's domestic violence call explained that there was a "fairly visible red mark on her right shoulder and red marks on her forearm/bicep area," which he testified were "indicative of injury" and that the former girlfriend said they were from Aaron. And the police report about that incident had been available well before the close of testimony and was a matter of public record that could have been easily identified with due diligence. Additionally, the court acted within its discretion to decline to reopen testimony to add evidence of a visitation report from May 8, 2021, in which the supervisor documented A.F.'s commentary about seeing Aaron's then-girlfriend's son without his clothes on. The court had already heard six days of trial testimony over the course of several weeks. We conclude that the dissolution court acted within its discretion to deny Mikela's motion to reopen testimony.

II.    Relocation Order

Mikela contends that the relocation court failed to consider the requisite RCW 26.09.520 factors before relocation could be granted, so she is entitled to a new trial. Alternatively, she claims that the trial court's findings were not

supported by substantial evidence because she demonstrated that relocation would have a detrimental impact on A.F. that outweighed its benefit. We disagree.

A reviewing court evaluates a trial court's grant of relocation for an abuse of discretion. Bay v. Jensen, 147 Wn. App. 641, 651, 196 P.3d 753 (2008). A trial court abuses its discretion when its decision is manifestly unreasonable or based on untenable grounds or made for untenable reasons. Id.

RCW 26.09.520 governs when a court may grant a parent's request to relocate. There is a rebuttable presumption that the relocation of the child will be permitted, which can be rebutted by a showing that the "detrimental effect of the relocation outweighs the benefit of the change to the child and the relocating person." RCW 26.09.520. Rather than a general "best interests of the child" standard,[15] RCW 26.09.520 contains eleven specific factors a trial court must consider to determine whether to allow relocation. In re Custody of Osborne, 119 Wn. App. 133, 144, 79 P.3d 465 (2003). These factors are:

> (1) The relative strength, nature, quality, extent of involvement, and stability of the child's relationship with each parent, siblings, and other significant persons in the child's life;
> (2) Prior agreements of the parties;
> (3) Whether disrupting the contact between the child and the person seeking relocation would be more detrimental to the child than disrupting contact between the child and the person objecting to the relocation;
> (4) Whether either parent or a person entitled to residential time with the child is subject to limitations under RCW 26.09.191;

---

[15] Compare RCW 26.09.002, which explains that the "best interest of the child" standard means

> The best interests of the child are served by a parenting arrangement that best maintains a child's emotional growth, health and stability, and physical care. Further, the best interest of the child is ordinarily served when the existing pattern of interaction between a parent and child is altered only to the extent necessitated by the changed relationship of the parents or as required to protect the child from physical, mental, or emotional harm.

23

(5) The reasons of each person for seeking or opposing the relocation and the good faith of each of the parties in requesting or opposing the relocation;
(6) The age, developmental stage, and needs of the child, and the likely impact the relocation or its prevention will have on the child's physical, educational, and emotional development, taking into consideration any special needs of the child;
(7) The quality of life, resources, and opportunities available to the child and to the relocating party in the current and proposed geographic locations;
(8) The availability of alternative arrangements to foster and continue the child's relationship with and access to the other parent;
(9) The alternatives to relocation and whether it is feasible and desirable for the other party to relocate also;
(10) The financial impact and logistics of the relocation or its prevention; and
(11) For a temporary order, the amount of time before a final decision can be made at trial.

RCW 26.09.520.

The court must consider each of the relocation factors to "ensure that trial courts consider the interests of the child and the relocating person within the context of the competing interests and circumstances required by the [relocation statute]." In re Marriage of Horner, 151 Wn.2d 884, 895, 93 P.3d 124 (2004). When assessing whether a trial court has abused its discretion by failing to document its consideration of the relocation factors, a reviewing court asks two questions: "Did the trial court enter specific findings of fact on each factor? If not, was substantial evidence presented on each factor, and do the trial court's findings of fact and oral articulations reflect that it considered each factor?" Id. at 896-97 (holding the trial court abused its discretion by failing to satisfy either method of documenting its consideration of the child relocation factors).

Here, the relocation court satisfied its obligation to address each factor in writing in its lengthy memorandum opinions, which were both incorporated into its

24

final orders.[16] Nevertheless, Mikela assigns error to multiple aspects of the relocation court's findings, arguing that the findings were not supported by substantial evidence. We discuss these arguments within the framework of the statutory relocation factors and the court's findings as to each.[17]

As to the first factor, strength, nature, and quality of the relationship with each parent and other significant persons in the child's life, the relocation court found that A.F. had an "equally strong, loving relationship with both parents," but that "[t]he Father's relationship had been closer and more stable during the last about two years and Mother's [was] closer and more stable in the three years prior." This finding was supported by both parents' testimony. The record demonstrated that although Aaron had been deployed for much of A.F.'s initial three years of life, they remained close and he cares for her well and provides her with a stimulating learning environment and opportunities for growth. Further, the record indicated that although Mikela had been A.F.'s primary caretaker for her initial three years of life while Aaron was deployed, she had also been in a relationship with and lived with a person who abused her, which created an unstable environment. Therefore, there is substantial evidence in the record to support the relocation court's findings as to factor one.

---

[16] Mikela argues that the relocation court wholly failed to consider the quality of life factor and "address[ed] others only obliquely," but otherwise does not point to which factors she believes were given only cursory consideration.

[17] Mikela states "[t]here is some question as to whether or not the presumption [in favor of the relocating parent] should apply in this matter," if the reviewing court determines that the dissolution court erred in entering the initial parenting plan. However, as discussed above, we conclude the dissolution court acted within its discretion by naming Aaron as the primary residential parent.

As to the second factor, the court found that there were no prior agreements between the parties regarding relocation and a long-distance parenting plan. Mikela does not challenge this finding. As to the third factor the impact of disruption of contact between the child and relocating party or between the child and the challenging party, the court found that disruption to contact with Aaron or Mikela would be detrimental given their strong bond with A.F., but that disruption with Aaron would be more detrimental because of his significant involvement in parenting. This finding was supported by substantial evidence. The court explained that Mikela's residential visits were already sparse, so relocation would not constitute a significant change to her contact with A.F. Further, the court recognized the detrimental impact on Mikela by deciding to order "some additional time given to [Mikela] in light of the longer transportation times and [A.F.'s] anxiety over not seeing [Mikela] enough."

As to the fourth factor, limitations on either parent, the dissolution court had previously placed RCW 26.09.191 limitations on Mikela for mental health problems, substance abuse, and withholding A.F. from Aaron. The court noted that it could consider any changes a parent had taken pursuant to the original parenting plan to reduce the impact of the limitation factors. In reviewing these limitations, the relocation court found that there was no longer a significant risk that Mikela would withhold A.F. from Aaron, based on evidence that there had been no withholding incidents since the final parenting plan had been entered. The court also considered the evidence that Mikela complied with her substance abuse evaluation and treatment plans and that she did not need any additional

treatment. The court noted that the prior .191 findings were still binding, but based on the evidence that Mikela's "substance abuse was a situational problem" that had resolved, it was no longer impacting her ability to parent. As to Mikela's mental health limitation, the record demonstrates that she complied with the parenting plan and sought psychological evaluations and had nearly completed with her counseling treatment. Again, the court noted that these changes did not negate the .191 limitation, but that her previous mental health problems were no longer impacting her ability to parent.

Additionally, the court noted while it had not imposed .191 limitations on Aaron based on substance abuse, the parenting plan required Aaron to get a substance abuse evaluation and comply with any recommended treatment. The court noted evidence in the relocation trial that Aaron "was not entirely honest" with the substance abuse evaluator and that he did have a mild substance use disorder. Further, finding that Aaron had not fully complied with the prior orders, the court ordered Aaron to undergo another evaluation and comply with any recommended treatment. However, the court found the history of substance abuse was not currently impacting his parenting.

As to Mikela's claim that the court did not sufficiently consider Aaron's domestic violence history, to the contrary, the court discussed the evidence at length. It reasoned that the physical struggle between Mikela and Aaron when Mikela was trying to leave Aaron's house with A.F. was not an act of domestic violence as defined in RCW 26.09.191, but that due to this incident, neither parent was permitted to physically discipline A.F. Further, the court concluded

the incident between Aaron and his former girlfriend likely constituted domestic violence but did not require a mandatory .191 limitation because it was a single act and it neither constituted a "history of acts of domestic violence" nor caused grievous bodily harm or fear of grievous bodily harm, as required by the statute. In the alternative, the court found that "[n]ot only did [Mikela] fail to prove sufficient domestic violence to trigger the mandatory limitation in RCW 26.09.191, even if she did prove it," the RCW 26.09.191(2)(n) exception to the mandatory requirements applied. Based on Aaron's assault of his former girlfriend and "tug of war" incident with Mikela, the relocation court ordered Aaron to either obtain a domestic violence evaluation and comply with treatment or attend anger management and substance abuse treatment and to comply with any recommendations. It also placed conditions on Mikela based on her previous relationship with JM. While Mikela claims on appeal that the court placed a mandatory .191 limitation on her residential time in the revised parenting plan, the court explicitly stated "the mandatory domestic violence restrictions in RCW 26.09.191 do not apply," but that "new conditions [were] necessary to protect the best interests of the child." Thus, the court imposed conditions on both Aaron and Mikela, based on the possibility that domestic violence issues for both and Aaron's substance abuse issues could affect their respective abilities to parent. Therefore, the relocation court's findings as to the reduced necessity of limitations and placing new conditions were supported by substantial evidence.

As to the fifth factor, whether the relocation and objection to relocation were made in good faith, the court considered evidence and found that both

28

Aaron's relocation and Mikela's objection were made in good faith. The record shows that Aaron's need to relocate was prompted by naval orders and that he would have been penalized had he chosen to ignore them. Also, as the court recognized, relocation would restrict Mikela's residential time with A.F. and would require her to pay significant costs to maintain her visitation times. Uncontroverted and substantial evidence supported these findings.

As to the sixth factor, the age and development of the child and impact of relocation, the relocation court found that relocation would not "negatively impact [A.F.'s] physical, educational, or emotional development so long as she receives counseling and visitation periods are increased." The record demonstrated that A.F. is a child who did not have any special educational or medical needs. Although Mikela was concerned about A.F. exhibiting sexualized behavior, the record indicated that this behavior was not sufficient to indicate any sexual contact had occurred. Therefore, the relocation court appropriately considered evidence regarding the sixth factor and recommended A.F. enter counseling to address her sexualized behavior and distress after leaving Mikela.

As to the seventh factor, quality of life of the child and relocating parent in the current and intended location, the relocation court found that the "quality of life, resources, and opportunities available are equal between the two locations." Mikela contends that A.F.'s quality of life in Washington was good and there were insufficiently specific findings regarding A.F.'s quality of life after relocation. However, more specific findings are not required as long as there was substantial evidence presented on each factor, and the trial court's findings and "oral

29

articulations" reflect that it considered each factor. <u>Horner</u>, 151 Wn.2d at 896-97. Here, the record shows substantial evidence was presented to support the court's finding that A.F.'s quality of life, resources, and opportunities were equal in Maryland and Washington. There was evidence at trial that Aaron had enrolled A.F. in several extracurricular activities in the new location and had set up a new home near adequate schools and child-friendly activities. Mikela ignores that the quality of life of the relocating parent is also part of this factor. The court also heard evidence regarding Aaron's quality of life, including Aaron's testimony that in the proposed location, Maryland, there were significant "federal employment opportunities" that were available to people with his skillset, and he would also have good employment opportunities following his retirement from the Navy.

As to the eighth factor, alternative means to continue the relationship with the challenging parent, the relocation court considered the evidence and found that FaceTime and phone conversations were available and had been regularly used by the parties. But it also found that the dissolution court's parenting plan was disproportionate, because even though Aaron was the parent who relocated, Mikela was burdened with all transportation expenses. To alleviate this burden, the relocation court proposed that Aaron share in the responsibility of transportation costs to support Mikela's residential time. Further, it suggested that additional residential time should be provided to Mikela to compensate for the time that A.F. is in transit and ultimately made such changes in its updated parenting plan.

As to the ninth factor, alternatives to relocation and the feasibility of the challenging party to relocate, the relocation court found that Aaron's alternative to relocation was not reasonable because it would result in harsh penalties to his career (e.g. dishonorable discharge). Further, the relocation court contemplated that Mikela could feasibly relocate to Maryland given that her job was a contract-based and that her lease was about to terminate. These findings were supported by substantial evidence and resulted in changes in the modified parenting plan.

As to the tenth factor, the financial impact of relocation, the relocation court found that the impact on Aaron if he were prevented from relocating "would be devastating" and that the impact on Mikela would be "financially and logistically very difficult, if not impossible . . . unless the long-distance transportation provisions" were changed. This finding was supported by substantial evidence. For example, Aaron testified that if he were prevented from relocating, he would be in "AWOL status," would lose his pension and benefits from his 18 and a half years of service, and could be subject to criminal prosecution in military court. Further, Mikela's residential time would be significantly strained absent an amendment to the long-distance transportation provisions in the dissolution court's order, which required her to pay for the cost of transporting A.F. for her residential time and would strain her ability to work. Based on the expense, the court specifically noted that it would modify residential time to allow for make-up time lost due to travel and for shared expenses of long distance transportation. The court properly considered the tenth factor and its findings are supported by substantial evidence.

We conclude that the relocation court made all of the necessary RCW 26.09.520 statutory findings and that each finding was supported by substantial evidence. Further, the court properly applied the presumption of relocation and determined that Mikela had not satisfied her burden of showing that the detrimental effect of the relocation outweighed the benefit of the change to A.F. and Aaron, as the relocating parent.

Relatedly, Mikela also challenges the revised parenting plan and assigns error to the limitations on her and the assignment of Aaron as the primary residential parent. The findings in the court's memoranda regarding the relocation factors were the basis for the parenting plan, and, as discussed above, substantial evidence supported those findings. The court properly exercised its discretion in crafting the amended parenting plan.

III.     Racial Bias

Mikela argues that the dissolution and relocation courts did not treat her evidence fairly and violated her state and federal constitutional rights to equal protection by engaging in harmful racial stereotyping against her as a woman of color and in favor of Aaron, a white male, despite evidence that would prompt limitations. Mikela compares the weighing of the four recurring issues of substance abuse, domestic violence, mental health, and relocation to demonstrate the court's alleged racial bias.

The Washington Supreme Court has recognized that racial bias "[w]hether explicit or implicit, purposeful or unconscious . . . has no place in a system of justice," and that when racial bias "is a factor in the decision of a judge or jury,

that decision does not achieve substantial justice, and [] must be reversed."
Henderson v. Thompson, 200 Wn.2d 417, 421-22, 518 P.3d 1011 (2022), cert.
denied, 143 S. Ct. 2412, 216 L. Ed. 2d 1276 (2023). Determining whether racial
bias impacted a verdict involves a two-step inquiry that requires (1) a party to
make a prima facie showing that racial bias affected the verdict and (2) the court
to hold a hearing to determine whether an objective observer could conclude that
racial bias contributed to the outcome. Id. at 439-40. As stated in Henderson, "[i]n
ruling on a motion for a new civil trial, '[t]he ultimate question for the court is
whether an objective observer (one who is aware that implicit, institutional, and
unconscious biases, in addition to purposeful discrimination, have influenced jury
verdicts in Washington State) could view race as a factor in the verdict.' " Id. at
422 (quoting State v Berhe, 193 Wn.2d 647, 665, 444 P.3d 1172 (2019)).

As an initial matter, it is not apparent from the record that Mikela ever
raised the issue of racial bias below.[18] In Henderson, the plaintiff requested an
evidentiary hearing under State v. Berhe, 193 Wn.2d 647, 444 P.3d 1172 (2019).
See Henderson, 200 Wn.2d at 428. Mikela did not request such a hearing. Even
assuming she has not waived her claims of racial bias, we conclude that she
does not make a prima facie showing that racial bias affected the outcome of
either the dissolution or the relocation trial.

---

[18] We need not search the record in support of claims asserted by the appellant. RAP
10.3(a).

A party makes a "prima facie showing" of implicit racial bias[19] when there is " 'evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred.' " Berhe, 193 Wn.2d at 665 (quoting Johnson v. California, 545 U.S. 162, 170, 125 S. Ct. 2410, 162 L. Ed. 2d 129 (2005)). Mikela's purported evidence of bias consists of examples of what she posits are different treatment of her and Aaron. But for none of these examples does Mikela provide any analysis as to how racial bias, implicit or otherwise, may have affected the decision. Instead, she relies solely on the fact that she is African American and he is white, without identifying any instance in which any participant in the trials referenced either of the parents' races. Even when there are such references at trial, we have previously cautioned, "While simple references to differences among individuals may trigger unconscious bias in some jurors, this court will not presume that such an impact occurs whenever a litigant acknowledges their background or culture where relevant to issues in a legal action." Simbulan v. Nw. Hosp. & Med. Ctr., 32 Wn. App. 2d 164, 187, 555 P.3d 455, petition for review filed, No. 103671-0 (Wash. Dec. 5, 2024) (citing State v. Zamora, 199 Wn.2d 698, 715, 512 P.3d 512 (2022) ("not all express mentions of race will carry the danger of appealing to jurors' potential racial bias")).

Mikela asserts that because the dissolution court engaged in "aggressive[]" cross-examination of her evidence regarding her substance use

---

[19] Implicit racial bias, is that which "manifests in apparently race-neutral explanations for actions and decisions that were, in fact, influenced by unconscious racial bias." Berhe, 103 Wn.2d at 665-66.

versus Aaron's and found that she was not credible, this disparate treatment evidenced potential racially motivated bias. However, a trial court is permitted to question witnesses called by the parties. ER 614(b). A trial court judge has broad discretion to ask such questions, particularly in a bench trial. See Pierce v. Bill & Melinda Gates Foundation, 15 Wn. App. 2d 419, 443-44, 475 P.3d 1011 (2020). The questions here appear necessary and appropriate, and Mikela fails to establish a prima facie showing of bias by the court in conducting the examination.

Similarly, as other examples of alleged racial bias, Mikela points out ways in which the court appeared to treat her and Aaron differently on similar issues. She complains that

- The dissolution court disproportionately weighed evidence that she did not meet the criteria for substance use disorder but then recommended she participate in an educational class,[20] whereas the court did not place limitations on Aaron despite evidence that he had substance abuse issues.

- The dissolution court failed to limit Aaron when there was evidence indicating he engaged in domestic violence, whereas it placed limitations on her for having previously resided with the man who perpetrated domestic violence against her.[21]

- The dissolution court removed her as the primary custodian of A.F. after she took A.F. to San Diego to get away from JM, while the

---

[20] Mikela cites to trial exhibit 123 in support, but this exhibit is not part of the appellate record. Further, the portions of the report of proceedings to which she cites relate to a discussion about the validity of a document, not the topic in the briefing.

[21] Specifically, she points to the testimony of the officer who responded to a domestic violence call involving Aaron and his former girlfriend who explained that there was a "fairly visible red mark on [the former girlfriend's] right shoulder." Further, Mikela contends that at relocation she proffered evidence that Aaron had a DVPO against him and that the Navy had found he met the criteria for having perpetrated domestic violence, but that the court did not seriously consider this.

relocation court continued to allow Aaron to be the primary caregiver despite relocating absent proper notice.[22]

- The dissolution court placed conditions on her for her mental health based on her history, and absent any medical proof of such issues, instead relying solely on Aaron's allegations of her mental health issues and barring her from supplementing the records to allow her own mental health expert to testify.

These examples all share two characteristics: (1) Mikela provides no explanation as to how either explicit or implicit racial bias impacted the decision, and (2) they are the same issues Mikela raises as substantive error. While Henderson requires courts to review the totality of circumstances of the trial, 200 Wn.2d at 439, Mikela fails to explain how any of the evidence or arguments before the trial court, or conduct by the trial court, evoked or perpetuated racial stereotypes or reflected bias. To the extent she disagrees with the court's decisions as to how to weigh evidence, the fact finder has discretion to weigh the evidence. In re Marriage of Black, 188 Wn.2d 114, 127, 392 P.3d 1041 (2017). A litigant's mere invocation of racial bias does not transform a court's exercise of discretion in ruling against a litigant into a constitutional issue. Mikela fails to satisfy her burden of making a prima facie showing of racial bias regarding the trial court's decisions, including in addressing the issues of substance abuse, domestic violence, or mental health, and in its decisions naming Aaron as the primary residential parent and allowing him to relocate.

Mikela's claims are more akin to ordinary judicial bias claims rather than the uniquely egregious circumstances present in Henderson. But she also fails to

---

[22] She argues that she was penalized despite having a valid reason for going to San Diego and giving Aaron notice, but that Aaron was not penalized when he violated the parenting plan by moving absent notice to her and without court approval.

sufficiently argue or satisfy the standards for such claims. While "trial before an unbiased judge is an essential element of due process," "[t]here is a presumption that a trial judge properly discharged his/her official duties without bias or prejudice." In re Pers. Restraint of Davis, 152 Wn.2d 647, 692, 101 P.3d 1 (2004). "Judicial rulings alone almost never constitute a valid showing of bias." Id. A party asserting judicial bias "must provide specific facts establishing bias" to overcome the presumption. Id. at 692-93; see also Tatham v. Rogers, 170 Wn. App. 76, 96, 283 P.3d 583 (2012) (mere speculation of judicial bias is insufficient). A "[c]asual and unspecific allegation[] of judicial bias" cannot prevail on appeal. Rich v. Starczewski, 29 Wn. App. 244, 246, 628 P.2d 831 (1981).

As our Supreme Court stated in Henderson, "a verdict affected by racial bias is incompatible with substantial justice." 200 Wn.2d at 434. To establish that such bias merits an evidentiary hearing, our Supreme Court first requires a prima facie showing of bias.[23] Here, Mikela fails to establish either a prima facie showing of bias required by Henderson for an evidentiary hearing and provides only unspecific allegations of judicial bias. We therefore deny her claims that racial bias affected her trials and requires reversal.

IV.     Attorney Fees on Appeal

Both parties seek attorney fees pursuant to RCW 26.09.140. Mikela additionally seeks costs under RCW 26.09.140 and as a prevailing party under

---

[23] Otherwise, for example, "future litigants may effectively be incentivized to erase their backgrounds, cultures, and races in order to increase their chances of a secure and final verdict," while "others could be tempted . . . to proactively introduce evidence of their own ethnicity or primary language to ensure another chance at litigation in the event of an unfavorable verdict." Simbulan, 32 Wn. App. 2d at 187.

RAP 14.2. We also have discretion to award attorney fees and costs in dissolution proceedings on appeal. RCW 26.09.140. Additionally, RAP 14.2 provides that costs will be awarded to the substantially prevailing party.

However, neither party has complied with RAP 18.1(c), which requires that "[i]n any action where applicable law mandates consideration of the financial resources of one or more parties regarding an award of attorney fees and expenses, each party must serve upon the other and file a financial affidavit no later than 10 days prior to the date the case is set for oral argument or consideration on the merits." Accordingly, we deny both parties' requests for fees. We also deny Mikela's request for costs, as she is not the substantially prevailing party on appeal.

Affirmed.

_____
Chung, J.

WE CONCUR:

_____          _____
Feldman, J.                                          Smith, J.